## IN THE UNITED STATES DISTRICT COURT

### FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Crim. No. 12-47-LPS |
| | ) |
| REINALDO MORALES FIGUEROA, | ) |
| | ) |
| Defendant. | ) |

Lesley F. Wolf, Esquire, OFFICE OF THE UNITED STATES ATTORNEY FOR THE DISTRICT OF DELAWARE, WILMINGTON DE.

Counsel for Plaintiff.

Luis A. Ortiz, Esquire, LAW OFFICES OF LUIS ORTIZ, PHILADELPHIA, PA.

Counsel for Defendant.

## **MEMORANDUM OPINION**

June 24, 2013
Wilmington, Delaware.

**STARK, U.S. District Judge:**

## INTRODUCTION

On June 26, 2012, a federal grand jury indicted Reinaldo Morales Figueroa ("Defendant") on a charge of knowingly possessing a firearm after having been convicted of a crime punishable by imprisonment for a term exceeding one year, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). (D.I. 10) Defendant moved to suppress evidence, including a firearm, seized pursuant to execution of a search warrant on May 25, 2012. (D.I. 15) The Court held an evidentiary hearing on Defendant's motion on November 20, 2012. (*See* Transcript (D.I. 24) ("Tr."))

Pursuant to Federal Rule of Criminal Procedure 12(d), below the Court sets forth its findings of fact and conclusions of law. For the reasons stated below, the Court will deny Defendant's motion.

## BACKGROUND

In May 2012, Thomas Curley, a Wilmington Police Department ("WPD") detective with nearly 15 years of experience investigating major crimes, began an investigation into an assault case. (*See* Tr. at 4-13) According to Curley's testimony at the evidentiary hearing on Defendant's motion, a victim alleged that he had been assaulted by the same assailants on consecutive days, May 13 and 14, 2012. (*Id.* at 4-5) The victim stated that the assaults occurred at or around the area of 5 Carpenter Street, Wilmington, Delaware. (*Id.* at 5)

In particular, with regard to the May 13 assault, the victim reported that two Hispanic males "exited the garage at 5 Carpenter Street" and then punched and pistol-whipped him with a handgun before firing shots in the air. (*Id.*) Curley testified that the victim "was able to describe

1

and draw which [side of the] garage [that] the suspect came out of as the easternmost garage in
the block, on the south side on the street with a side door on the west side of the building." (*Id.*
at 19) Regarding the May 14 assault, the victim asserted that two Hispanic males exited a black
Chrysler automobile with tinted windows and again pistol whipped him – with the same handgun
that had been used the day before – at or around the area of 5 Carpenter Street. (*Id.* at 5) The
victim alleged that at least one of the males involved in the May 13 assault was also involved in
the May 14 assault. (*Id.*) "The other Hispanic male had a baseball bat and beat him." (*Id.*)

As part of his investigation, Curley went to 5 Carpenter Street, which he described at the
hearing as "a single building with two garage doors and a single garage door in the middle with a
No. 5 on it, and a door on the right side of the garage [where] there wasn't a doorknob. [There]
was a chain in place . . . of a doorknob." (*Id.* at 6-7) According to the victim's account as
understood by Curley, the chain handled door on the right side of the premises is the door from
which the assailants exited just before assaulting the victim on May 13. (*Id.* at 10)

Curley further described 5 Carpenter Street as consisting of multiple garages not of the
same height, having different brick colors, and looking as if they had been built at different
times. (*Id.* at 22, 25, 45, 48-49) As part of his investigation, Curley noticed only one electric
meter at the property. (*Id.* at 6) At 5 Carpenter Street, Curley further observed a black Chrysler
automobile matching the description provided by the victim. (*Id.* at 5, 12) Curley learned
through investigation that the vehicle was registered to an owner at 1103 Cedar Tree, Claymont,
Delaware. (*Id.* at 12) Curley was able to ascertain that the vehicle owner's description matched
the victim's description of one of the assailants. (*Id.*)

Curley undertook additional investigation regarding 5 Carpenter Street. He conducted a

2

computer-aided dispatch search ("CAD") of the property, from which he learned that the WPD
had no record of any previous interaction with 5 Carpenter Street. (*Id.* at 11) Curley then
completed a parcel search and learned that an individual named Shakira Martinez ("Martinez")
owned 5 Carpenter Street. (*Id.*) The parcel search further revealed that while 5 Carpenter Street
had no rentable units (*id.* at 12), it was at some point part of a multi-deed/parcel transaction (*id.*
at 53). The parcel search also indicated that 5 Carpenter Street was an automotive repair
building. (*Id.* at 12) The deed showed no subunits or listings such as A's, B's, 1's, or 2's. (*Id.* at
11-12, 29-30, 33-34, 39, 46-47, 51; Def.'s Hrg. Ex. 1-2) In his search warrant affidavit and
police report, Curley described 5 Carpenter Street as "a set of garages." (*Id.* at 19)

Curley did not investigate whether there were any utility contracts associated with 5
Carpenter Street. (*See id.* at 22) Nor did he interview the owner of the property or neighbors
prior to the search, as he felt such a step would threaten officer safety. (*Id.* at 30, 45)

On May 24, 2012, Curley obtained search warrants for both 5 Carpenter Street and 1103
Cedar Tree. (*Id.* at 14) The search warrants were executed nearly simultaneously on May 25,
2012 around 6:00 A.M. (*Id.* at 14-15) One of the alleged assailants was found at 1103 Cedar
Tree, but neither the other assailant nor the firearm were located there. (*Id.* at 15)

Members of the WPD's Special Weapons and Tactics ("SWAT") Team participated in
execution of the search of 5 Carpenter Street. (*Id.* at 60) The SWAT Team is responsible for
"ensur[ing] that the area [to be searched] . . . is secure and safe and all individuals therein are
detained." (*Id.* at 57) SWAT Team members do not participate in the ensuing searches. (*Id.* at
59) Instead, SWAT Team operators conduct the initial entry into target locations, making them
secure, and subsequently turn "everything over to the detectives that are actually investigating

3

that search warrant." (*Id.* at 57)

SWAT Team member Corporal Nicholas Sibbaluca testified at the evidentiary hearing on Defendant's motion. (*Id.* at 55) Sibbaluca has worked for the WPD for six years, including three years as a member of the WPD's SWAT Team, in which capacity he has been involved with activities in connection with execution of at least 100 search warrants. (*Id.* at 56, 59)

Sibbaluca testified that in connection with its activities relating to execution of a search warrant, SWAT Team procedures require immediately detaining and placing in Flex-Cuffs any individuals discovered after an initial entry, in order to protect officer safety. (*Id.* at 57) "Flex-Cuffs are hard, flexible plastic handcuffs, non-metallic, that are quick to deploy, quick to use in an instance where speed is necessary." (*Id.* at 56)

Sibbaluca testified about his participation, along with approximately 20 other SWAT team members, in activities relating to execution of the search warrant at 5 Carpenter Street on the morning of May 25, 2012. (*Id.* at 60-61) The SWAT Team simultaneously entered both non-garage doors: the chain handle door located on the right side of the property as well as the door in the center of the property. (*Id.* at 62-64) Sibbaluca testified that both doors were entered simultaneously for the purpose of maintaining officer safety by "overwhelm[ing] any individuals inside with SWAT operators." (*Id.* at 62) This was consistent with ordinary practice, which involves SWAT Team members entering two doors even to a solid structure known to have no subunits within it. (*Id.* at 62-63)

Sibbaluca entered 5 Carpenter Street through the door located in the center of the two garage doors, not through the chain handle door on the right side of the property. (*Id.* at 64) Within two minutes of entering the property, Sibbaluca assisted another SWAT Team member in

4

securing a room within the property. (*Id.* at 66) In this room, Sibbaluca found Defendant lying on his stomach on a sofa bed against a far wall. (*Id. at* 66, 68) Defendant was wearing only an undergarment and had his hands underneath pillows. (*Id.* at 68) As a safety precaution, SWAT Team members verbally commanded Defendant to show his hands; despite giving such commands at least 15 to 20 times, Defendant did not initially comply. (*Id.*) The commands were given in English, and it was later learned that Defendant did not speak English. (*Id.* at 69)

Eventually, Defendant complied by showing his hands. (*Id.*) Sibbaluca then immediately placed Defendant in Flex-Cuffs, assisted him in getting dressed, and searched the immediate area in which Defendant had been discovered, to ensure there were no weapons that could be used against officers. (*Id.* at 69-71) In doing so, Sibbaluca located a "two toned colored semi-automatic handgun that was laying underneath the pillows where [Defendant's] hands were at." (*Id.* at 71) While wearing gloves, Sibbaluca "picked up the weapon and dropped the magazine from the weapon to ensure there either was or was not ammunition in" it. (*Id.*) Then Sibbaluca placed the loaded magazine back in the weapon, placed it back in the spot in which he had discovered it on the sofa bed, and left the premises. (*Id.*) Sibbaluca testified that approximately 45 seconds passed from the time he discovered Defendant until when he discovered the firearm. (*Id.* at 71-72) Thereafter, the area was secured, and Sibbaluca and the SWAT Team turned everything "over to detectives so that they could continue their investigation." (*Id.*)

Upon entering 5 Carpenter Street, officers discovered that a brick wall ran across the depth of the structure, perpendicular to the center door. (*Id.* at 35-37) The internal brick wall separated 5 Carpenter Street into two units. (*Id.* at 35) Prior to execution of the search warrant, officers, including Curley and Sibbaluca, did not know that 5 Carpenter Street contained multiple

5

units. (*Id.* at 35-37, 52-53) Defendant, and the evidence he seeks to suppress, were found within the unit located to the left of the center of the "two garage type doors." (*Id.* at 64)

## LEGAL STANDARDS

The Fourth Amendment of the United States Constitution states: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." "The threshold requirement for issuance of a warrant is probable cause." *United States v. Ritter*, 416 F.3d 256, 262 (3d Cir. 2005). A search and seizure made pursuant to a warrant based on probable cause is generally reasonable. *See Katz v. United States*, 389 U.S. 347, 356-57 (1967).

"Apart from requiring probable cause, the warrant clause of the Fourth Amendment also unambiguously requires that warrants must particularly describe the place to be searched, and the persons or things to be seized." *Ritter*, 416 F.3d at 264-65 (internal quotation marks omitted). "The manifest purpose of this particularity requirement was to prevent general searches." *Maryland v. Garrison*, 480 U.S. 79, 84 (1986). Therefore, "the scope of a lawful search is defined by the object of the search and the places in which there is probable cause to believe that it may be found." *Id.* (internal quotation marks omitted).

In assessing a challenge to a search based on overbreadth, the Court looks to "whether the officers' failure to realize the over breadth of the warrant was objectively understandable and reasonable." *Id.* at 87. The constitutionality of law enforcement's conduct in executing a warrant is judged "in light of the information available to them at the time they acted." *Id.* at 85.

6

congress

More specifically, "officers' conduct [must be] consistent with a reasonable effort to ascertain and identify the place intended to be searched within the meaning of the Fourth Amendment." *Id.* at 88.

The exclusionary rule provides that evidence collected in violation of a defendant's constitutional rights may be inadmissible in a criminal prosecution. *See Weeks v. United States*, 232 U.S. 383, 388 (1914). Thus, "the exclusionary rule is designed to deter police misconduct rather than to punish the errors of judges and magistrates." *United States v. Leon*, 468 U.S. 897, 916 (1984). "But when the police act with an objectively reasonable good-faith belief that their conduct is lawful, . . . the deterrence rationale loses much of its force." *Davis v. United States*, ___ U.S. ___, 131 S. Ct. 2419, 2426 (2011) (internal citations and quotation marks omitted).

## DISCUSSION

Defendant challenges the validity of the warrant as well as the reasonableness of the manner in which it was executed. (D.I. 15 at 4) Based on the credible testimony at the evidentiary hearing provided by Curley and Sibbaluca, and in light of the totality of the evidence, the Court concludes that the search warrant was both validly issued and reasonably executed.

**The Search Warrant Was Valid**

Defendant contends that the Court should suppress the semi-automatic handgun found in the vicinity proximate to him because the warrant issued for 5 Carpenter Street did not adequately describe the place to be searched and the things to be seized. (D.I. 26 at 9-11) Defendant argues that "the warrant did not describe the structure as it was known or should have been known." (*Id.* at 11) As the government correctly observes (and Defendant appears to concede), the Court's task is to determine whether "the search warrant at issue described 5

7

Carpenter Street as it was known or should have been known after a reasonable inquiry under the circumstances." (D.I. 25 at 11-12) In other words, "[t]he validity of the warrant must be assessed on the basis of the information that the officer disclosed, or had a duty to discover and disclose" to the judge who issued the warrant. *Garrison*, 480 U.S. at 85.

Curley conducted a reasonable and adequate investigation of 5 Carpenter Street prior to presenting the search warrant application to the issuing judge. Specifically, Curley had by that time conducted: (1) physical surveillance of the premises, observing one labeled door in the center of the structure, a side door with a chain in the place of a doorknob, and only one electric box (Tr. at 6-7); (2) a CAD search through which he determined that WPD had no history with the property located at this address (*id.* at 11); and (3) a parcel search from which he learned that the property was listed as a commercial auto service center, with no rentable units and no subunits (*id.* at 11-12). Based on this investigation, it was reasonable for Curley to believe that 5 Carpenter Street consisted of a single auto service center with no rentable subunits.

Under the circumstances, Curley's failure to contact utilities providers or the owner of 5 Carpenter Street was not unreasonable. That portions of the structure had different physical appearances, and appeared to have been built at different times, did not, under the circumstances, require more investigation than Curley undertook. The Court is persuaded that, most likely, Curley could not have learned that there was no internal access between the left and right sides of the structure located at 5 Carpenter Street without entering the structure – entry which is precisely what Curley sought to do through his application for a search warrant.[1] Facts "that

---

[1]Until his post-hearing briefing, Defendant appeared to agree that there was probable cause for the search warrant. In his post-hearing brief, however, Defendant contended, for the first time, that he does not concede the existence of probable cause and wishes to preserve his

emerge after the warrant is issued have no bearing on whether or not a warrant was validly issued." *Garrison*, 480 U.S. at 85.

In short, the search warrant described the premises to be searched as it was known or should have been known after a reasonable inquiry. Accordingly, the Court rejects Defendant's request to suppress evidence based on a purported failure to satisfy the particularity requirement.

**The Search Warrant Was Reasonably Executed**

Defendant further contends that the search warrant was executed in an overbroad manner. The Court disagrees.

The firearm Defendant seeks to suppress was found by SWAT Team members during their initial sweep of the building, which was completed within two minutes after their entry into the premises. (Tr. at 71-72) Sibbaluca discovered the weapon underneath a pillow only about 45 seconds after Defendant removed his hands from that same area under the pillow. (*Id.* at 72) For officer safety, Sibbaluca had conducted a limited search of the sofa bed in which he had found Defendant, seeking to determine if there were dangerous weapons, a precaution which was particularly necessary given that Defendant had kept his hands obscured under the pillow in defiance of repeated commands to show his hands. (*Id.* at 70; *see also generally Muehler v. Mena*, 544 U.S. 93, 100 (2005) (recognizing safety risk inherent in executing search warrant for weapons))

---

rights with respect to this issue. (D.I. 26 at 9) The Court concludes that there was probable cause to support the search warrant, based at least on the victim's statement that his assailants came out of 5 Carpenter Street prior to the May 13 attack and the evidence Curley obtained corroborating the victim's description of the property. *See Illinois v. Gates*, 462 U.S. 213, 230 (1983) (explaining judicial officers employ "totality of circumstances" "common sense approach" in determining whether probable cause exists).

Case 1:12-cr-00047-LPS Document 34 Filed 06/24/13 Page 11 of 11 PageID #: 196

The Court does not agree with Defendant that the SWAT Team was confused as to which door to enter. Instead, the Court is persuaded by the credible evidence that the SWAT Team entered both doors of the structure located at 5 Carpenter Street because doing so was consistent with its policy to use sufficient force from multiple entry points to overwhelm those who might be inside the premises. (Tr. at 62-63) Moreover, given especially that Sibbaluca's radio was not functioning properly (*see id.* at 62), he did not learn anything once he began executing the search warrant that did or should have caused him to conclude that he was executing a search beyond the scope of what was reasonably permitted by a valid search warrant. *See Ritter*, 416 F.3d 256, 267 n.9 ("[T]he Supreme Court [has] recognized that officers, depending upon when the error is discovered, will either have to limit their search (which assumes the warrant's mistake is noticed before entry into an unrelated area) or discontinue the search (assuming, as was the case in *Garrison*, that officers have already mistakenly undertaken a search of premises outside the scope of the search warrant.")).

Accordingly, the Court rejects Defendant's request to suppress evidence based on the purported unreasonable execution of the search warrant.

## CONCLUSION

Defendant's motion to suppress (D.I. 15) will be denied.

10